## SAVAGE v. DISTRICT OF COLUMBIA.
### Nos. 509, 510 and 513.

Municipal Court of Appeals for the
District of Columbia.
July 18, 1947.
Rehearing Denied Sept. 3, 1947.

John A. Savage, pro se.

Edward A. Beard, Ass't. Corp. Counsel, of Washington, D. C. (Vernon E. West, Corp. Counsel, and Chester H. Gray, Principal Ass't. Corp. Counsel, both of Washington, D. C., on the brief), for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

Appellant was convicted in the Criminal Branch of the Municipal Court under three separate informations. The first charged him with using premises at 1303 Fairmont Street, Northwest, for a purpose other than a single-family dwelling without first having been issued a "certificate of occupancy"; the second charged him with operating the same premises as a rooming house between June 14, 1946, and October 31, 1946, without a license; the third charged him with using the same premises as a rooming house without a license between November 1, 1946, and December 11, 1946. In the occupancy permit case he was fined $10 and ordered to serve 10 days in jail if the fine was not paid; and in each of the two license cases he was sentenced to a $100 fine or 30 days in jail in default of paying the fine. The sentences were ordered to run consecutively. He took an appeal as of right from the judgments in the two license cases, and we granted an application for allowance of appeal in the occupancy permit case.[1] On motion of appellant the cases were consolidated for trial below and heard together here.

Appellant has assigned a large number of errors. The facts necessary to a consideration of each of such assignments will be stated in connection therewith. In general, according to testimony by appellant, he acquired the premises in 1940 and obtained licenses to operate as a rooming house in 1941, 1942, 1943 and 1944. He also applied for an occupancy permit but never received one. In May 1945 an inspection by the health authorities disclosed certain violations of health regulations, and appellant has had no license since that time. After the charges were filed but before trial appellant made certain changes to conform to health regulations.

I

Alleged Invalidity of License Regulations

With respect to the license charges appellant contends that he was not operating a rooming house because he had only six roomers and therefore required no license. This contention is based upon the fact that an act of Congress, Code 1940, § 5—312(b) defines a rooming house as a building in which rooms are rented and sleeping quarters provided to accommodate 10 or more persons not including the family of the owner or lessee. This provision, however, now contained in Chapter 3 of Title 5 of the Code entitled "Fire Escapes and Safety Provisions" was enacted as a separate statute and by its terms the definitions contained therein were restricted to such act.

The statutory provisions with respect to occupancy permits, health regulations and licenses were enacted in entirely different acts. By an act now codified as Code 1940, § 1—226, the Commissioners are authorized to make and enforce "all such reasonable and usual police regulations * * * as they may deem necessary for the protection of lives, limbs, health, comfort and quiet of all persons * * * within the District of Columbia." The "General License Law" for the District of Columbia is contained in Code 1940, Chapter 23, § 47—2301 et seq. Section 47—2301 provides that no person shall engage in any business, trade, profession, or calling in the District of Columbia for which a license fee or tax is imposed by the terms of such statute without first having obtained a license so to do. A large number of businesses such as theaters, massage establishments, hotels, lodging houses for transients, etc., are listed in the statute itself as requiring licenses. Section 47—2344 authorizes the Commissioners of the District of Columbia "when in their discretion such is deemed advisable" to require a license of other businesses or callings not listed in the chapter and which "in their judgment require inspection, supervision, or regulation by any municipal agency" and to fix the license fee therefor. Section 47—2345 authorizes and empowers the Commissioners to make any regulations that may be necessary in furtherance of the purpose

---

[1] Code 1940, § 11—772(a).

of the act. By a series of regulations beginning July 10, 1941, the Commissioners, under authority of the General License Law, required licenses for rooming houses and fixed the license fee therefor. The last order on the subject, dated November 24, 1943, defined a rooming house as meaning any building or part thereof, other than a hotel or private club "containing sleeping accommodations occupied for a consideration by more than four persons who are not members of the immediate family of the owner or lessee of such building or part thereof, which said sleeping accommodations do not form a separate household unit or units with bath and kitchen exclusively for the use of the persons (not members of the immediate family of the owner or tenant) occupying such unit or units."

By these regulations entitled "Lodging, Rooming and Boarding House Regulations," the Commissioners provided that no license to operate a rooming house be issued unless a certificate of the Health Officer is first obtained attesting that the premises are conducted in accordance with detailed standards and unless the Major and Superintendent of Police certify that the operator is morally qualified to conduct such a house. The detailed standards specify tests to be applied by the Health Officer before issuing his certificate. They include such items as overcrowding, lighting, heating, ventilation, the furnishing of clean bedding and bathrooms, and general safety and sanitation requirements.

While not directly applicable, it is of interest to note that Congress on December 2, 1941, adopted the District of Columbia Emergency Rent Act, Code 1940 (Supp. V), § 45—1601 et seq., and in Section 45—1607(b), as amended September 26, 1942, defined a rooming or boarding house as one in which living quarters are rented by the householder to more than four persons.

It seems abundantly clear that it was reasonable for the Commissioners of the District of Columbia to use a different definition of a rooming house with respect to health and licensing provisions than was adopted by Congress with respect to fire escape regulations.

It has often been decided that the District of Columbia Commissioners are creatures of statute, possessing no inherent powers, and not constituting a municipal corporation, but are merely the executive agents of a peculiar form of municipal government created by Congress in which Congress has reserved to itself the power of general legislation and of municipal regulation.[2] It is fundamental, also, that the legislature can not delegate its power to make a law, but it is equally well established that it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend.[3] Here Congress laid down the general rule that businesses, trades, professions, or callings in the District of Columbia should be licensed provided they were of the character requiring inspection, supervision or regulation. It is true that Congress specified certain businesses to be so licensed, but we believe that it had the power, as it did, to authorize the District Commissioners to determine when additional businesses should be included in such category, provided, of course, such determination is made by reasonable standards and is not arbitrary. We take judicial notice of the fact that the license regulations in question were adopted during the war emergency when thousands of people were coming to Washington to live in rooming houses, and that it was vitally necessary to protect their health. We believe also that the regulations come within the standard fixed by Congress. The taking of one, two, three, or four roomers by a private family, particularly during the war, might not constitute a business, but when rooms are provided for five or more we think the Commissioners were justified in determining such an enterprise to be a business and providing reasonable health regulations therefor. The requiring of licenses for rooming houses as businesses has been upheld in other jurisdictions.[4]

We conclude that the District Commis-

---

[2] Newman v. Willard's Hotel Co., 47 App.D.C. 323.

[3] La Forest v. Board of Commissioners, 67 App.D.C. 396, 92 F.2d 547, certiorari denied 302 U.S. 760, 58 S.Ct. 367, 82 L.Ed. 588.

[4] State ex rel. Altop v. City of Billings, 79 Mont. 25, 255 P. 11, 54 A.L.R.

sioners had the power to adopt the regulation in question and that it was reasonable for the designated purpose.

## II

### Estoppel

Under the heading of estoppel, appellant urges with respect to the occupancy permit case that he was never given an opportunity to correct conditions which led to the failure to issue such a permit and that with respect to the second license case the conditions complained of had been cured prior to the trial, and hence that this case should have been dismissed by the trial court.

The prosecution for failure to obtain an occupancy permit was brought under the zoning law, Code 1940, § 5—401 et seq. The Zoning Regulations issued pursuant to that act prohibit the use of any building for any purpose other than a single-family dwelling until the Inspector of Buildings, upon written application, shall have issued a certificate of occupancy stating that such use complies with the requirements of the regulations and that the building complies with the regulations and the "building code for such use." (Section XX, Zoning Regulations.)

The evidence produced by the District showed that appellant applied for an occupancy permit for these premises for use as a rooming house May 8, 1944, that such application was rejected June 19, 1944, and that no occupancy permit had ever been issued for the use of the premises as a rooming house. The building inspector testified that the reason the occupancy permit had not been issued in 1944 was failure of defendant to make the following changes: "fireproof transoms, fireproof furnace room ceiling, cover with metal jam and trim and inside face of furnace room door. Make door selfclosing. Replace wallboard partition on (sic) basement with fireproof material." Appellant admittedly knew of this rejection and the reasons therefor. He claimed some of them had been cured in 1945 but that he had been unable to obtain metal to cover the furnace room door because of war conditions. He also claimed that since he had heard nothing from the occupancy permit application for a long time he assumed that the law in that respect was no longer being enforced.

The information on this charge was filed December 11, 1946, and accused appellant of operating without an occupancy permit between June 14, 1946, and the date of the filing of the information.

It results that the evidence is undisputed that appellant did use these premises for a purpose other than a single-family dwelling without an occupancy permit between the dates specified, that he was notified as long ago as June 19, 1944, why his application had been refused and that in at least one respect, fireproofing the door to the boiler room, he did not correct the condition complained of. We agree with appellant that once an application has been made applicants are entitled to notice of action with reasons therefor. Here the appellant was given such notice and thereafter it became his duty either to obtain an occupancy permit or to cease the use applied for.[5]

The same situation obtains with respect to the first license charge—of operating a rooming house without a license between June 14, 1946, and October 31, 1946. Under the General License Law, licenses run from November 1, to October 31 of the succeeding year. The evidence showed that as early as October 19, 1945, a letter was sent to appellant specifying certain violations of health regulations; that on June 19, 1946, appellant first applied for a rooming house license for these premises for 1946, and therefore operated for a time without even applying for a license; also that in June 1946 a notice was sent to appellant disapproving the application. He continued to operate during the remainder of such license year without a license. The testimony, therefore, clearly shows he had ample opportunity to correct conditions complained of before prosecution was begun.

---

1091; Cutsinger v. City of Atlanta, 142 Ga. 555, 83 S.E. 263, L.R.A.1915B, 1097, Ann.Cas.1916C, 280; 11 Am.Jur., "Constitutional Law," § 289. See Engel v. O'Malley, 219 U.S. 128, 31 S.Ct. 190, 55 L.Ed. 128.

[5] United States v. Slobodkin, D.C. D.Mass., 48 F.Supp. 913, 917.

■ With respect to the second license charge, the evidence shows that about November 1, 1946, appellant was called into the Corporation Counsel's office and told by an assistant corporation counsel that prosecution would be started for operating without a license. Appellant stated he did not believe he was operating a rooming house and would decide within a week whether or not to apply for a license. He made such application November 8, 1946. On December 18, 1946, a letter was sent him by the License Bureau informing him that the application had been disapproved, based upon an unfavorable report by the Health Department. Conversations and communications followed with the result that at the time of the trial, February 27, 1947, the assistant corporation counsel announced that the conditions complained of by the Health Department had been remedied. The information in this case was filed December 11, 1946, and charged the operation of the rooming house without a license between November 1 and December 11, 1946. It results that between November 1 and November 8 appellant had not even applied for a license and that through December 11, 1946, he continued to operate without a license. The fact that the conditions complained of were remedied subsequently does not change this situation.

### III

### Jury Trial

■ Appellant's demand for jury trial was denied by the trial court. With respect to the occupancy permit case, it is his position that since he was charged with using the premises without an occupancy permit on June 14, 1946, and on other days between that date and the date of the filing of the information, and since the statute permitted a fine of $100 per day, a total fine of many thousand dollars might have been imposed, and thus he was entitled to a jury trial. With respect to the license cases, the penalty provided by the statute, Code 1940, § 47—2347, is a fine of not more than $300 or imprisonment for not more than 90 days. Appellant urges that since two informations charging violations of the License Act were filed against him at the same time, he could have been fined a total of $600 or imprisoned for a total of 180 days. He urges further that since the trial judge made the three sentences run consecutively and not concurrently the penalties were thereby made cumulative.

It is our conclusion that the trial judge ruled correctly in denying appellant a jury trial. Code 1940, § 11—616. Although the three cases were consolidated for trial, each charged a separate offense, and the maximum penalty which could have been imposed in the occupancy permit case was $100, and was $300 or 90 days in jail in each of the license cases. The imposition of sentences to run consecutively does not result in a cumulative sentence.[6] Standing alone, a single offense of using premises for a purpose other than a single-family dwelling without having obtained an occupancy permit or of operating a rooming house without a license is a petty offense not involving moral turpitude nor indictable at common law. Therefore a jury trial is not demandable as of right either under the Constitution or under the D.C.Code.[7] Furthermore, where the offense charged is a continuing one, even though the statute involved makes each day a separate offense, an information charging a violation on a certain day with a continuando clause added results in only one offense being charged.[8] Thus in each case here the maximum penalty which the court could have imposed was below the penalty fixed by the statute as entitling the offender to a jury trial.

### IV

### Former Acquittal

■ In connection with the charge of operating the premises without an occupancy permit appellant filed a plea in

[6] Harris v. Lang, 27 App.D.C. 84, 7 Ann.Cas. 141, 7 L.R.A.,N.S., 124; Harris v. Nixon, 27 App.D.C. 94, certiorari denied 201 U.S. 645, 26 S.Ct. 761, 50 L.Ed. 903.

[7] District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843.

See also Yeager v. District of Columbia, D.C.Mun.App., 33 A.2d 629.

[8] Grissom v. State, 119 Tex.Cr.R. 494, 43 S.W.2d 580; cf. Skelly v. United States, 10 Cir., 76 F.2d 483; State v. Murray, 237 Mo. 158, 140 S.W. 899; 11 Wharton's Criminal Procedure (10th ed.) § 1410.

bar on the ground that he had been previously acquitted of the same offense. The evidence showed that he had been charged in a previous information with using the premises for other than a single-family dwelling without an occupancy permit between November 1, 1945, and February 7, 1946, and that he was found not guilty of that charge on June 13, 1946. The present charge involves an entirely different and subsequent period, i.e., from June 14, 1946, to December 11, 1946. Each information contained a continuando clause, usual in such cases in this and other jurisdictions, in which it was alleged that the offender on the first date alleged "and divers other days between that date" and the last date named committed the specified offense. Under the zoning law [9] and Section XX of the Zoning Regulations of the District of Columbia, adopted February 11, 1941, only one occupancy permit is required so long as a building continues to be used for a particular purpose, and it is the position of appellant that since he was acquitted once of this charge for a previous period he cannot be placed in jeopardy again even though the period covered in the second information is for a later period of time. At the trial of the present case appellant admitted that although he had applied for an occupancy permit for these premises none had ever been issued to him.

We believe the trial court correctly overruled the plea in bar. The zoning statute provides that violations of the zoning regulations may be punished by a fine of not more than $100 for each day that the violation continues. The offense charged was a continuing one and each day's use of the premises as other than a private dwelling without an occupancy permit was a new offense. It is well recognized that an acquittal in a trial for an offense which is a continuing course of conduct bars a second information charging the commission of the same offense prior to the beginning of the first prosecution but not for a similar offense after disposition of the first case.[10] We are not advised of the ground of the first acquittal but obviously that ground was not that appellant had an occupancy permit. He admitted he had never had one for these premises.

## V
### Alleged Illegality of the Sentence

Appellant contends that the sentences imposed were illegal because he was ordered imprisoned. This assignment of error is utterly without merit. The record shows clearly that the jail sentences were only to take effect if the fines were not paid. This method of sentencing is specifically authorized by D.C.Code 1940, § 11—606. It does not constitute a jail sentence but is only a necessary method of enforcing payment of fine.[11]

## VI
### Opportunity to Defend

Appellant urges that the information charging him with operating a rooming house without a license between June 14, 1946, and October 31, 1946, was not properly before the court and hence that he had no opportunity to defend himself on that charge. In support of this contention appellant in his briefs makes several statements not in the record, but apparently the basis for the claim is that when he was arraigned on February 26 this particular charge was not referred to. The other charges were not heard on that day but were continued to the next day to enable appellant to obtain counsel. On February 27 he elected to serve as his own counsel. At that time he objected to being arraigned on the disputed charge on the ground that it had not been before the court the day before. The trial court then told him that all three charges were to be tried and proceeded to have appellant arraigned on all three charges, reading each of the informations to him. Appellant refused to plead to any of the informations, and thereupon

---

[9] Code 1940, § 5—401 et seq.

[10] Ellingham v. State, 163 Md. 278, 162 A. 709; State v. Wood, 168 Minn. 34, 209 N.W. 529; State v. Johnson, 212 N. C. 566, 194 S.E. 319; Smith v. State, 55 Tex.Cr.R. 320, 116 S.W. 593. See Fall v. United States, 60 App.D.C. 124, 49 F. 2d 506, certiorari denied 283 U.S. 867, 51 S.Ct. 657, 75 L.Ed. 1471; District of Columbia v. Horning, 47 App.D.C. 413.

[11] Anderson v. District of Columbia, D.C.Mun.App., 48 A.2d 710. See Harris v. Lang, 27 App.D.C. 84, 7 Ann.Cas. 141, 7 L.R.A.,N.S., 124.

the court entered a plea of not guilty for him as to each charge. The discussion regarding the number of charges was had at a morning session of the court. At the afternoon session he was arraigned again, and upon his renewed refusal to plead in any of the cases, pleas of not guilty were again entered by the court in each. The information in the disputed case is a part of the record now before us. It shows that the information was filed December 11, 1946, that appellant deposited $25 collateral on this charge, that it was called in court along with the other charges on several different occasions beginning January 22, 1947, and each time continued at the request of the defendant. Beyond the mere fact that the case was not called on February 26 and that appellant had not been furnished in advance with a copy of the information, no showing has been made that appellant was in any way prejudiced by the trial on this charge. He did not ask that the trial be continued when the charge was read to him on February 27. There is no requirement that a person accused of a violation of a municipal ordinance be furnished with a written accusation against him, and it is sufficient if he be informed of the charge and given a reasonable opportunity to defend himself before judgment is given.[12] In our opinion, he had ample opportunity and did in fact present considerable evidence bearing on the charge.

## VII

### Refusal of the Court to Permit Appellant to Speak Before Passing Sentence

 There is nothing in the record showing whether appellant is a lawyer, but he conducted his own defense skillfully and persistently, with many detailed references to legal precedents. After the Government had closed its case, he testified at length, concluding by saying, "I think I am through." Thereafter the assistant corporation counsel stated he would submit the case without argument, but appellant exercised his right of arguing the case. Following such argument the assistant corporation counsel replied and thereafter appellant made a further detailed argument. His statements had to do not only with questions affecting his actual guilt but with reasons for not obtaining the required permit and licenses. The court then ruled on the legal question of whether appellant had conducted a rooming house and announced that he would study the transcript of the testimony, would take the case under advisement, and would notify appellant when he was ready to dispose of it. The case was called again on April 12, with appellant present, and the court announced that no more testimony or argument would be allowed and proceeded to find appellant guilty of each of the charges and pronounced sentence. After a brief discussion between appellant and the court as to the penalties imposed, appellant for the first time suggested that the court had not permitted him to say anything before pronouncing sentence. He now assigns such refusal as error, although in his brief he concedes that this is not "fatal error in misdemeanor cases."

Rule 12(a) of the Criminal Division of the Municipal Court provides that "Before imposing sentence the Court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment." This is a salutary rule. Although it has often been held that allocution is not necessary in misdemeanor cases,[13] the Municipal Court itself by adopting the rule has made it applicable. However, rule 17(a) of the Municipal Court provides that "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." We are convinced that appellant's substantial rights in this respect were not infringed because of the frequent opportunities given and used by him to testify fully and to argue his position exhaustively on every phase of the cases.

---

[12] 3 McQuillin, Municipal Corporations (2d Ed. 1943) § 1138, p. 826.

[13] Turner v. United States, 5 Cir., 66 F. 289; State v. Legan, Mo.Sup., 80 S. W.2d 122; People v. Kaminsky, 208 N. Y. 389, 102 N.E. 515; 113 A.L.R. 834; State v. Ball, 27 Mo. 324.

## VIII
### Refusal of Leave to Introduce Further Testimony

The decisive issue in the occupancy permit case was whether appellant was operating without such a permit. The Government closed its testimony in this case after evidence that no occupancy permit had been issued and that the issuance was denied because of non-compliance with several building regulations, including "fireproof furnace roof ceiling" and "replace wallboard partition on basement with fireproof material." In answer to a question by appellant on cross-examination, the Government's building inspector testified that he had visited the premises on two occasions in January 1947, that the boiler room had not been fireproofed and that there were holes in the plaster in the ceiling. Appellant himself testified that he had looked up his records the morning of the trial and had found that he had fireproofed the boiler room in accordance with regulations in May 1945 and stated the cost of the work. He did not, however, produce such records at the trial. In his concluding argument on the same day appellant called attention to the discrepancy between his testimony and the testimony of the building inspector and added, "I want to continue this case (the occupancy permit case) if you are not satisfied with my testimony and let Mr. O'Connell come out there and look at it again. I think he will see that it has been fireproofed in accordance with the regulations." The case was taken under advisement by the court from February 27 until April 12. On April 12, the date set by the court for disposition of the case, appellant for the first time filed a motion saying he had been taken by surprise by the building inspector's testimony and asking leave to call two additional witnesses who had performed work in 1945 in the boiler room and had inspected the boiler room on April 10, 1947, and that the same was in perfect condition, and that there were no holes in the ceiling or elsewhere in the fireproofing. The trial court overruled this motion.

The reopening of the case for the taking of additional testimony after the case has been closed is a matter within the judicial discretion of the trial court, which will not be reviewed on appeal in the absence of a clear abuse of discretion.[14] The testimony at the trial with respect to the visit of the building inspector to the premises in January 1947 and the conditions found there was not brought out by the Government but was induced on cross-examination by appellant. The condition of the premises in 1947 was not an issue in the trial. During the trial itself appellant had denied the building inspector's testimony in certain respects and had recited that he had had the walls and ceiling of the boiler room fireproofed in 1945. Hence, the testimony he wanted to introduce later would have been merely cumulative. It could have had no bearing on whether appellant had obtained an occupancy permit. Furthermore, appellant let over a month pass after the trial before claiming "surprise." While, of course, every reasonable opportunity should be given defendants to present their defense, we have concluded that under the circumstances the trial judge did not abuse his discretion in refusing to reopen the case.

Judgment in each case is affirmed.

---

[14] Gilbert v. Lachapelle, 75 U.S.App.D.C. 395, 127 F.2d 750.